369 So.2d 391 (1979)
VOLUME SERVICES DIVISION OF INTERSTATE UNITED CORPORATION, and Interstate United Corporation of Florida, Inc., Petitioners,
v.
CANTEEN CORPORATION, Koolee, Inc., and Thomas B. Trierweiler, Respondents.
VOLUME SERVICES DIVISION OF INTERSTATE UNITED CORPORATION, and Interstate United Corporation of Florida, Inc., and Tampa Sports Authority, Appellants,
v.
Thomas B. TRIERWEILER, Canteen Corporation, and Koolee, Inc., Appellees.
Nos. 78-1897, 78-1903, 78-1931 and 78-2026.
District Court of Appeal of Florida, Second District.
March 28, 1979.
Thomas T. Steele of Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, for Volume Services Division of Interstate United Corp. and Interstate United Corp. of Florida, Inc.
C. Lawrence Stagg and Michael A. Fogarty of Stichter, Stagg, Hoyt, Riedel & Fogarty, P.A., Tampa, for Tampa Sports Authority.
John W. Boult and W. Crosby Few of Few & Ayala, Tampa, for Canteen Corp.
*392 Michael C. Addison and Richard Benjamin Wilkes of Trenam, Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, Tampa, for Koolee, Inc.
J. Rex Farrior, Sr. and Joseph G. Thresher of Shackleford, Farrior, Stallings & Evans, P.A., Tampa, for Thomas B. Trierweiler.
GRIMES, Chief Judge.
These appeals involve a controversy stemming from the award of the concessions franchise at Tampa Stadium.
In March of 1977 the Tampa Sports Authority (TSA) announced its intention to enter into a new ten-year contract for the concessions franchise at Tampa Stadium. Paragraph 15(b) of the bid specifications provided:
Acceptance and rejection of proposals.
(b) The right to enter into the formal license agreement shall be awarded to the responsible bidder submitting the highest percentage of gross receipts. In determining whether a bidder is responsible the authority may consider financial responsibility, general experience and reputation of a bidder and any other reasonable criteria.
Several concessions companies submitted bids pursuant to the specifications. TSA voted to accept the bid of Interstate United Corporation of Florida, Inc. (Interstate) even though Ogden Food Service Corporation (Ogden) and Canteen Corporation (Canteen) had each submitted a bid pledging a higher percentage of gross receipts to TSA than had Interstate. On June 30, 1977, Interstate and TSA entered into a contract permitting Interstate to sell food, drink and other items at the Tampa Stadium for a period of ten years.
Thomas B. Trierweiler (Trierweiler), a resident of Tampa and an employee of Ogden, filed a taxpayer's suit against TSA challenging the legality of the contract between TSA and Interstate. Trierweiler prayed for an injunction preventing Interstate's further operation at the stadium and requested the court to award the concessions contract to Odgen, the highest bidder. TSA sought to justify its award to Interstate on the comparison of (1) past performances in other stadia similar to Tampa Stadium, (2) management personnel, and (3) potential volume of sales.
A summary judgment was entered on June 28, 1978, holding that TSA did not have the right to prepare the bid specifications in a manner which reserved undefined discretion to select other than the highest bidder. The court reasoned that by including in paragraph 15(b) of the specifications the words "and any other reasonable criteria" TSA had improperly reserved the right to determine what "other reasonable criteria" it might choose to apply until after the submission of the bids. The court observed that specifications for bidding on a public project must be definite enough on points of material concern as to allow an objective comparison of bids on a common basis. The court voided the contract between TSA and Interstate and ordered TSA to rebid the franchise and to issue new bid specifications in compliance with the summary judgment. Interstate, which had already begun to perform under the contract, was permitted to continue to handle the concessions for a limited period of time pending rebidding. TSA did not appeal the summary judgment.
TSA revised its bid specifications to provide as follows:
1. Determination of Qualification of Bidders.
(a) Authority reserves the discretion based on the criteria set out in this subsection to determine whether particular bidders have the basic qualifications to conduct a food and beverage service concession for a facility of the size of the Stadium. This determination shall be in addition to procedures for selection of the concessionaire under section 2 of this article. A bidder who is determined on the basis of the listed criteria to lack the basic qualifications to conduct the concession at the Stadium will not be awarded the right to enter the formal license agreement, regardless of percentage bid or other relevant merits of the proposal.

*393 (b) In determining whether a bidder possesses the basic qualifications to operate, the Authority will consider the following:
(1) Experience in operation of similar facilities, or in operation of any facility having a seating capacity in excess of 40,000.
(2) Past performance of the bidder at the Stadium or at other facilities.
(3) Bidder's general reputation for performance and service.
(4) Bidder's financial condition.
(5) Bidder's existing service contracts and ability to expand operations.
2. Selection of Concessionaire.
(a) Bidders are advised that the Authority intends to select as concessionaire the qualified bidder who the Authority determines, based on the criteria set out below will provide the Authority with the opportunity to maximize its revenues from the concession operation, while at the same time providing high quality products and efficient service to Stadium patrons.
(b) In order to determine which proposal will provide the Authority with the opportunity to maximize its revenue from concessions, the Authority will consider the following factors, none of which will, standing alone, be conclusive.
(1) The percentage of gross receipts from concessions bid.
(2) The historical per capita production from sale of food and beverage concessions by the Bidder:
(A) At the Stadium, if any.
(B) At similar facilities for events similar to those conducted at the Stadium, if any.
(C) At all events at similar facilities, if any.
(D) At dissimilar facilities for events similar to those conducted at the Stadium, if any.
(E) At dissimilar facilities for all events.
(3) Bidder's experience and general performance at operating food and beverage concessions at the Stadium and at other similar facilities, as shown by personal knowledge of or experience with the bidder, if any, by inspections of other facilities which have been or may be made by or on behalf of the Authority, or by the other criteria set out in this article.
(4) The experience, training and past performance of those persons designated by the bidder as proposed management-level personnel regarding operation of concessions at the Stadium.
(5) The criteria for determination of qualifications set out in Section 1 of this Article.
(c) In order to determine whether a bidder will insure that patrons of the Stadium will be provided high-quality products and prompt, efficient and satisfactory service, the Authority will consider each of the criteria set forth in sections 1 and 2 of this Article, relating to past performance and service.
TSA received seven bids in response to the new specifications. With respect to the percentage of gross receipts to be paid to TSA, the parties interested in this litigation bid as follows:

 Koolee, Inc. 46.3%
 Canteen Corporation 44.15%
 Ogden Food Service Corporation 44.13%
 Interstate United Corporation of Florida, Inc. 42.1%

TSA referred the bids to its concessions committee for preparation of a recommendation to the full authority. The concessions committee, in turn, ordered its staff to submit a report and recommendation to the committee. The staff recommended an award to Canteen.[1] The full concessions committee, however, met and decided that, in consideration of all of the factors listed in the specifications, Interstate should be awarded the contract. The committee members relied heavily on their conclusion that Interstate's experience would generate *394 higher per capita sales which would ultimately result in higher revenue for TSA. The full authority accepted the committee's recommendation and voted to award the contract to Interstate.
At this point, Koolee, Interstate and Canteen were permitted to intervene in the litigation. Trierweiler and Canteen moved to set aside the award to Interstate. On October 23, 1978, the court set aside the award of the concessions contract to Interstate on the ground that TSA had not complied with the summary judgment by making an objective comparison of the bids on a common basis. The court directed TSA to "reconsider" its decision to contract with Interstate. Canteen also filed a petition for writ of mandamus to require TSA to award the concessions contract to Canteen, and Koolee moved for an order compelling an award to Koolee because of its status as the highest percentage bidder.
TSA then met in special session to reconsider its decision to award the concessions contract to Interstate and voted once again to contract with Interstate. The court then entered an order dated November 1, 1978, invalidating the bid specifications because they did not conform to the final summary judgment. The court held that the only criteria which met the requirements of objectivity was the comparison of percentage of gross receipts pledged. The court ordered TSA to redraw the specifications and to rebid the contract. The court, however, affirmed TSA's finding that Koolee was not a qualified bidder because of its lack of experience in large stadia. Finally, the court directed that should the bid specifications be upheld on appeal, an objective consideration of all factors required an award to Canteen. TSA, Interstate and Koolee each seek review of the orders of October 23, 1978, and November 1, 1978.[2]
At the outset, we must consider Interstate's contention that upon the entry of the summary judgment of June 28, 1978, the court lost jurisdiction to enter orders with respect to the new specifications and the new bids in the absence of the filing of another lawsuit. Interstate points out that except for the limited circumstances under which modification is permitted, once a judgment becomes final, the court ordinarily loses jurisdiction to entertain further proceedings other than for purposes of enforcement. Davidson v. Springer, 109 Fla. 238, 147 So. 228 (1933); Hopwood v. Revitz, 312 So.2d 516 (Fla. 3d DCA 1975).
Canteen responds that the orders entered subsequent to the summary judgment amounted to nothing more than enforcement because TSA had failed to follow the directions of the court as set forth in the final judgment. Canteen points out that Interstate, itself, obtained permission to intervene in the proceeding and ultimately sought affirmative relief by requesting the court to allow it to continue as interim concessionaire after the expiration of the time period originally specified in the summary judgment. Canteen argues that since all of the interested parties were before the court and the subject matter of the dispute was within the court's jurisdiction, a denial of the court's authority to conduct the proceedings necessary to resolve this dispute would exalt form over substance.
We do not believe that the court was without jurisdiction to conduct the proceedings which occurred subsequent to the entry of the summary judgment. It may be that if an appeal had been taken from the summary judgment we would have concluded that the court erred in doing anything more than setting aside the original contract. See City of Miami Beach v. Klinger, 179 So.2d 864 (Fla. 3d DCA 1965). However, the fact remains that the summary judgment, from which no appeal was taken, ordered TSA to issue new bid specifications in compliance with the summary judgment. The matters involved in the subsequent proceedings *395 bore a sufficient relationship to enforcement so as to permit the court to proceed without the filing of a new action.[3] Moreover, there was an obvious need to continue to exercise jurisdiction in order to insure that TSA would have the services of an interim concessionaire until the award of a new contract.
On the merits, TSA and Interstate argue that the new specifications were not invalid and that TSA did not abuse its discretion in deciding to award the contract to Interstate. Canteen does not question the validity of the specifications but, because the court below did, we deem it advisable to address this point. In so doing, however, we will necessarily discuss the scope of TSA's discretion.
There is no common law rule requiring public agencies to let contracts through competitive bids. In the absence of specific constitutional or statutory requirements, a public agency has no obligation to establish a bidding procedure and may contract in any manner not arbitrary or capricious. Eggart v. Westmark, 45 So.2d 505 (Fla. 1950); William A. Berbusse, Jr., Inc. v. North Broward Hospital Dist., 117 So.2d 550 (Fla. 2d DCA 1960); 10 E. McQuillin, Municipal Corporations, § 29.31 (3d Ed. 1966); 64 Am.Jur.2d Public Works and Contracts § 34 (1972). Even when the receipt of bids is required by law, a public agency has no obligation to let a contract to a particular bidder  the lowest, the lowest and best or the lowest responsible bidder  in the absence of a directive to that effect in the controlling legislation.[4]
In William A. Berbusse, Jr., Inc. v. North Broward Hospital Dist., supra at 551, the low bidder attacked the award of a construction contract by a public hospital district to a higher bidder. The legislative act which created the district specified that construction contracts should be awarded "to the lowest responsible bidder, provided it is to the Owner's interest to accept the bid." In affirming an award of the contract to the higher bidder, this court said:
A public body is not required unqualifiedly to award the contract to the low bidder unless there exists a statutory requirement... .
TSA was created by Chapter 65-2307, Laws of Florida. Section 4 of this legislative act provides:
Section 4. General Powers. The Authority is hereby authorized and empowered:
.....
(1) to contract for the operation of concessions on or in any of the sports and recreational facilities of the authority; subject to reasonable public notice, bids and hearing.
Significantly, this act was amended to provide that in the case of purchase, lease or repair of tangible property, TSA must award the contract to the lowest responsible bidder. Ch. 69-1142, Laws of Fla. Thus, the legislature obviously intended for TSA to have more discretion in the determination of its concessionaire than in the selection of contractors or suppliers.[5]
Section 4 requires only public notice, bids and hearing. There is no suggestion that the bid specifications must be prepared in any particular manner. The absence of the *396 word "competitive" confirms that there is no mandate for specific criteria upon which the bids must be received.[6] Hence, there is no basis upon which to hold the specifications invalid for lack of objectivity.
Despite its lack of a requirement that the contract be awarded to the lowest responsible bidder, section 4 serves a substantial public purpose by requiring TSA to publicize its intention to award a contract, to receive bids on the contract, and to decide the award at a public meeting. If there are sinister influences abroad or if TSA intends to abuse its discretion, then these evils will become much more apparent under the spotlight of public scrutiny. This does not mean, however, that TSA does not retain the utmost discretion to decide which bidder should receive the contract.
Having reached this conclusion, we can easily dispose of the contention that Koolee should not have been disqualified from consideration because of its lack of concessions experience in stadia having a seating capacity of over 40,000 persons. The job of providing concessions at Tampa Stadium is a responsible undertaking, and TSA cannot be faulted for its desire to use a concessionaire with previous experience in comparable facilities. TSA was not obligated to provide Koolee with a springboard into the stadium concessions business.
While conceding TSA's discretion, Canteen argues that there is sufficient evidence in the record to support the court's conclusion that TSA abused that discretion. Much of the controversy in this matter centered upon the question of which of the bidders was most likely to generate the highest gross receipts from the sale of concession items at the stadium. TSA properly recognized that limiting its consideration to the percentage of gross receipts pledged by the bidders would be inadequate unless one assumed that all concessionaires would realize identical total sales. Accordingly, TSA asked the bidders to furnish historical data in the form of per capita sales, i.e. the average dollar amount sold to each person attending events at stadia served by the respective concessionaires. As a consequence, the bidders submitted per capita data of their performances at various football, baseball and soccer stadia throughout the country.
Canteen argues that after receiving all of this information, TSA arbitrarily declined to give any weight to the baseball and soccer figures and was only able to offset the higher percentage bid of Canteen by comparing Interstate's 1977 football per capita figures at several stadia with Canteen's 1977 football per capita figures at Schaeffer Stadium in Foxborough, Massachusetts, which is a cold weather stadium. In essence, Canteen says that if all of the per capita figures were given substantially equal weight, its figures were such that after the application of its higher percentage bid, TSA could be expected to derive more net revenue with Canteen as its concessionaire.
TSA says that a consideration of the soccer figures would not have affected the outcome of the revenue computations but admits that Canteen's performance in baseball stadia has been superior to Interstate's. TSA justifies its lack of reliance on baseball figures on the bases that no baseball is played or contemplated at Tampa Stadium and the sale of concession items at the two events differs because there is only one extended break in the action during a football game. TSA points out that Canteen serves only one pro-football stadium while Interstate serves three in addition to Tampa Stadium. Furthermore, Arrowhead Stadium in Kansas City, which is served by Interstate, is just as much a cold weather stadium as is Schaeffer Stadium in Massachusetts, and, in order to make a fair comparison, TSA could not exclude per capita figures for cold weather games at Schaeffer *397 Stadium without also eliminating the figures for cold weather games at Arrowhead Stadium. TSA also calls to our attention the finding of its concessions committee that Interstate had done a good job since taking over the Tampa Stadium concessions and that the quality of its services had been much better than that of Ogden's, the previous concessionaire.
In the final analysis, depending upon the weight given to the various categories of figures and the other factors, both sides can make a case for their respective positions.[7] No doubt this is what prompted the lower court's conclusion that subjective considerations played an important part in the award of this contract. But, as we have pointed out, TSA was not required to award this contract solely upon the basis of an objective comparison of percentage bids.
The nonpaid members of TSA have been given the responsibility of operating Tampa Stadium in the best interest of the citizens of Tampa and Hillsborough County. They fully complied with the governing legislation applicable to the award of the concessions contract. There is no suggestion of any fraud or overreaching in the determination to award the contract to Interstate. Canteen can make a strong case that its bid was more favorable, but we cannot say that TSA's decision was arbitrary, capricious or beyond the scope of its discretion. As our supreme court said in Culpepper v. Moore, 40 So.2d 366, 370 (Fla. 1949):
So long as such a public agency acts in good faith, even though they may reach a conclusion on facts upon which reasonable men may differ, the courts will not generally interfere with their judgment, even though the decision reached may appear to some persons to be erroneous.
The orders setting aside the award of the concessions contract to Interstate and invalidating the new specifications are reversed.[8]
BOARDMAN and RYDER, JJ., concur.
NOTES
[1] A mistake in the staff's figures was later discovered thereby putting into question part of the premise upon which the staff's recommendation had been made.
[2] Once the time in which Interstate had been permitted to serve as interim concessionaire had expired, the court appointed Canteen to act in this capacity until a new contract was properly awarded. Following TSA's appeal, this court reversed the trial court's denial of supersedeas and ruled that upon the posting of appropriate security Interstate could continue to handle the concessions pending our decision.
[3] Even though we have concluded that the court was not without jurisdiction to entertain further proceedings, we do not conceive that we are bound to limit our review to the mechanics of enforcement, particularly since the subject matter of the subsequent orders ranged substantially further.
[4] TSA sought high bids since the successful bidder would be required to pay TSA for the privilege of selling concessions in the stadium.
[5] Perhaps the reason for this distinction is that a concessions contract smacks more nearly of a contract for personal services. Florida has followed the lead of many other jurisdictions in construing its general statutes requiring competitive bidding for the award of contracts by public agencies as inapplicable to contracts for personal services. Parker v. Panama City, 151 So.2d 469 (Fla. 1st DCA 1963).
[6] Even where the governing legislation required the acceptance of the lowest bid, this court held that a public agency could properly include in its specifications a provision for bids on systems for maintenance in subsequent years. Hillsborough County Aviation Auth. v. Taller & Cooper, Inc., 245 So.2d 100 (Fla. 2d DCA 1971).
[7] The court took no testimony concerning the deliberations of TSA in the award of the contract to Interstate and relied primarily upon an examination of the minutes of TSA's meetings. Therefore, any findings of fact made by the trial court are entitled to less weight on appeal because this court enjoys an equal vantage point from which to discern what actions TSA took.
[8] While we are not called upon to approve the original summary judgment, we note that the basis upon which the court set aside the second award to Interstate was far different from the first. The original specifications provided that the contract would be awarded to the responsible bidder submitting the highest percentage of gross receipts, yet the high bidder was denied the contract on the basis of undisclosed criteria.