# GEORGE E. FAILING COMPANY v ST. JOHNS RIVER WATER MANAGEMENT DISTRICT

Case No. 87-1606BID

State of Florida, Division of Administrative Hearings

August 28, 1987

## APPEARANCES OF COUNSEL

**Linda M. Hallas** for petitioner.

**Wayne E. Flowers** for respondent.

## OPINION OF THE COURT

WILLIAM C. SHERRILL, JR., Hearing Officer.

### RECOMMENDED ORDER

The formal administrative hearing in this case was conducted in Palatka, Florida, on June 25, 1987 by William C. Sherrill, Jr., Hearing Officer.

The Petitioner presented testimony from Robert Auld, James Winchester as an expert witness, and Douglas Munch and Robert Schenk as adverse witnesses. The Petitioner also presented fifteen exhibits which were admitted into evidence. The Respondent presented testimony from Robert Schenk, Douglas Munch, Barbara Vergara, Ron

Owens and Lee Payton, and eight exhibits which were admitted into evidence. The hearing was tape recorded without a court reporter. There is no transcript. Both parties submitted proposed findings of fact and conclusions of law.

The primary issue in this case is whether the Respondent should have awarded a contract to the Petitioner for lease-purchase of one rotary drill rig pursuant to the invitation for bids dated November 6, 1986.

### Findings of Fact

1. It was stipulated by the parties that the Petitioner timely filed a notice of protest and formal written protest (if section 120.53(5), Fla. Stat. (1986) is applicable) and timely filed a petition for formal administrative hearing. The Petitioner did not receive a written notice of the recommended award of the District as intended by paragraph 9 of the General Conditions of the second invitation for bids, and it did file a notice of protest with seventy-two hours of receiving notification of the District's decision to award the contract to Mid America as intended by paragraph 10 of the General Conditions, P. Ex. 3.

2. It was stipulated by the parties that the substantial interests of the Petitioner are at stake in this proceeding.

3. The Department of Water Resources is involved in groundwater studies throughout the nineteen Florida counties that comprise the District, and is responsible for the District's drilling program.

4. In the past, the District's waterwells have been in the 500 to 800 foot range, and have been constructed of 4, 6, and 8 inch casing.

5. The Water Resources Department is currently constructing a regional groundwater monitoring network in the nineteen counties. The underlying geological formations differ greatly from county to county, and several water tables often have to be penetrated before the well reaches the Floridan aquifer. To maintain mud circulation, it is often necessary to case off portions of the well from water table to water table. Moreover, wells are often in unconsolidated formations, and casing is needed to provide support for the hole, particularly in the upper portions of the well. For these reasons, the District plans to construct step or telescoping wells in the regional groundwater monitoring network. The District expects that it will need to set 16 inch casing in the first eighty feet of some of these wells.

6. In about 1984, by competitive bids, the St. Johns River Management District (the District) leased a Speedstar 15-III drill rig from Mid American Drilling Equipment, Inc. This rig was a size larger than the

drill rig that is the subject of this formal administrative hearing, and had been manufactured in 1978.

7. The District was satisfied with the performance of the larger Speedstar drill rig, and had very few problems with it. District staff became familiar with the operation of the rig.

8. As the lease neared the end of its term, the District began to explore the question whether it should continue to lease, or should purchase its own rig. A member of the District Board suggested that the District consider acquisition of a rig over a period of years by lease-purchase. This suggestions was adopted by the Department of Water Resources of the District.

9. Due to his familiarity with the Speedstar rig, Mr. Munch decided to use that rig as a basis for bid specifications, but to use the next smaller size, a Speedstar SS-15. Mr. Munch copied the specifications from a Speedstar SS-15 specification sheet as the specifications for the first invitation for bids. Mr. Munch has had no education in engineering or in drill rig design. He has a degree and field work experience in geology, and is a licensed water well contractor. He has been a project manager on projects when outside contractors set 16 inch casing in wells as deep as 2,000 feet, but he has not personally set a 16 inch casing.

10. P. Ex. 1 is the first invitation for bids and specifications for the invitation for bids, as well as the bid of the Petitioner, the George F. Failing Company. This invitation for bids was published on or about · August 26, 1986.

11. The invitation for bids provided six bid blanks providing six bid alternatives. The bid blanks appeared as follows:

A.   One Year Lease $____/month, rental $____/month

B.   Two Year Lease/purchase $____/year, buy-out $____.

C.   Three Year Lease/purchase $____/year, buy-out $____.

D.   Four Year Lease/purchase $____/year, buy-out$____.

E.   Five Year Lease/purchase $____/year, buy-out $____.

\*     \*     \*

Suggested Purchase Price $ _____ .

Less 3% for payment in 20 days

12. Four bids were received pursuant to this invitation for bids, including the Petitioner's bid and the bid of Mid America Drilling Equipment, Inc., P. Ex. 7. The four bids were opened on September 11, 1986.

13. Mid America was the only bidder that bid a one year lease with an option to renew. Mid America, the Petitioner, and G & R Machine and Welding, Inc., were the only bidders to bid a lease-purchase.

14. The Petitioner's bid was $163,565.00 as an outright purchase price for a Failing model CF-15 and, relevant to the second bid, $5,432.00 per month for a three year lease-purchase, with the rig owned at the end of the three year lease period with no further buy-out payment. The Petitioner did not bid a one year lease. P. Ex. 1. Mid America bid $179,823.00 as an outright purchase price on a Speedstar SS-135, and $56,340.00 per year for a three year lease-purchase, with a buy-out price of $61,920.00. Mid America also bid a one year lease at $6,125 per month, with a renewal at $5,288.00 per month. P. Ex. 7.

15. Robert Schenk is the District's Director of the Division of General Services, and as such, Mr. Schenk was responsible for District purchasing and evaluation of the bids received pursuant to the invitation of bids.

16. Mr. Schenk prepared an analysis of several of the bids, including G & R Machine, Mid America, and the Petitioner. P. Ex. 8. Mr. Schenk testified that he felt that the Mid America bid was unclear because of the total amount of the bid calculated over the years. He said that he considered the Mid America bid for a three year lease-purchase to be ridiculous and out of line because it was $50,000 greater than the outright purchase bid.

17. The bid of the Petitioner for a three year lease-purchase was about $32,000 higher than its bid for an outright purchase. P. Ex. 8.

18. G & R Machine also bid a Speedstar SS-15. Mid America's three year lease-purchase bid was about $35,000 higher than the G & R Machine bid for the same three year lease-purchase. ($230,940 compared to $195,664.32) P. Ex. 8. The bid of Mid America was also high compared to the bid of G & R Machine for a four and a five year lease-purchase, but was comparable for a two year lease-purchase and for an outright purchase. The bid of the Petitioner was $16,000 lower than the Mid America or G & R Machine bids for an outright purchase, was $31,000 lower than the G & R Machine bid and $34,000 lower than the Mid America bid for a two year lease-purchase, and was slightly higher than the G & R Machine bid on all other bids. The bid of the Petitioner was substantially lower than the Mid America on all bids analyzed on P. Ex. 8.

19. Although the Mid America bid was high, it was not an unclear bid. The bid of Mid America was clear and unambiguous. P. Ex. 7.

138

20. Mr. Schenk thought that the Petitioner's bid was the clearest bid received in the first invitation for bids.

21. Apparently on the same day as the bid opening, which was September 11, 1986, Mr. Schenk had one of his assistant telephone Mid America to ask that it clarify its bid. In response, on the same day as the bid opening, September 11, 1986, Mid America sent the District a letter, P. Ex. 9, which effectively lowered its bid for a three year lease-purchase by $36,612.00. This letter was ultimately not considered by the District in the evaluation of the bids.

22. On September 23, 1986, four staff members of the Department of Water Resources, including Mr. Munch and Barbara A. Vergara, Director of that Department, recommended by memorandum to Mr. Schenk that the Mid America bid for a Speedstar SS-15 for an outright purchase price of $179,823.00 be accepted. These staff members were of the opinion that the drill rig bid by the Petitioner "did not meet all of the bid specifications due to slight manufacturing differences." But they were also of the opinion that "[t]hese differences may not be critical to the performance and capabilities of the equipment." P. Ex. 10. The staff comparison of the Mid America bid and the Petitioner's bid included calculations for rental costs due to the differing delivery times of the equipment, and calculated that the Mid America bid had a net cost of $184,435 compared to the Petitioner's bid having a net cost of $182,013.

23. Attached to the staff recommendation of September 23, 1986, was a comparison of the three drill rigs by specifications. The comparison used the incorrect specification sheet for the Mid America rig, and thus contained the following errors: the rig bid by Mid America had a single sheave, 3 part block, not a double sheave, 4 part block; the rig also had a working hook load of 20,000 pounds, not 32,700 pounds.

24. Two to four days after September 11, 1986, (the date of the letter from Mid America changing its bid for a three year lease-purchase) Robert Auld, the Florida Branch Manager of the Petitioner, learned that such a letter had been requested, written, and received by the District, and called District staff to protest. Mr. Schenk thereafter apparently concluded that solicitation and receipt of the bid change from Mid America had been procedurally erroneous because he testified that as a result of all of the discussion and criticism that surrounded that event, on the second invitation for bids he concluded that he was procedurally unable to contact any of the bidders to request clarification of bids, even though he then thought that the Petitioner's bid was unclear.

139

25. Mr. Schenk decided to reject all of the bids from the first invitation for bids before Mr. Auld's telephone call. P. Ex. 15, p. 10. But he did not communicate this decision to the staff of the Department of Water Resources before they wrote their memorandum that was initiated through the chain of command on September 23, 1986.

26. Mr. Schenk initially decided to reject all of the bids because the bidders had not all bid on all of the requested alternatives. Later, other reasons for rejection of all of the bids became apparent. Another major reason for rejection of all of the bids was because the specifications were drawn from the Speedstar SS-135 specifications, and unfairly eliminated the Petitioner's rig. Mr. Auld admitted that the Failing CF-15 did not meet the specifications of the first invitation for bids because the Failing CF-15 did not have an 8½ inch rotary table, but was of the opinion that it met all other specifications.

27. Mr. Schenk also rejected all of the bids because of the irregularity of having solicited and received the bid change from Mid America.

28. On October 1, 1986, the District informed all bidders that the bids were all rejected and that the purchase would be again advertised for bids.

29. No protest was filed concerning the first invitation for bids, and it was ruled during the formal administrative hearing that the foregoing facts are admissible as explanatory of the basis for the second invitation for bids, and not as a basis for challenge to the first invitation for bids.

30. Mr. Munch then drafted specifications for the second invitation for bids. This time, he specified "Speedstar SS-135 or equivalent." Mr. Munch had determined from his experience with the rented Speedstar that the Speedstar SS-135 was capable of fulfilling the needs of the District for drilling. His intention was to allow bids for other types of drill rigs that were functionally the equivalent of a Speedstar SS-15. Ms. Vergara defined the term "equivalent" to mean no differences between a Speedstar SS-135 and the alternative drill rig with respect to doing work in the field that needs to be done by the District.

31. At some time before the second invitation for bids was advertised, or at least before the second bids were filed, the District became primarily (though not exclusively) interested in receiving bids on a three year lease-purchase of a drill rig. Both the Petitioner and Mid America knew this before they prepared their second bids.

32. P. Ex. 3 is the second advertisement for bids and was published on November 6, 1986. The advertisement asks for bids on a "lease-

purchase of One Rotary Drill Rig." The attached sheet marked "specifications" stated that what was sought was a "[b]id for purchase or one year lease of a new Speedstar 135 rotary drill rig or at least the equivalent equipment with the following options." Following that were eight technical specifications. The second invitation for bids also specified the following:

A. "Bidder must indicate any and all exceptions to specifications."

B. "Bid shall be awarded to the lowest qualified, responsible bidder whose bid meets all specifications in the Invitation to Bid, including delivery, price and other factors most advantageous to the District."

33. All bidders were to bid using the bid blank attached to the invitation for bids. The bid blank was different from the first invitation for bids apparently with the intent to make bid comparison easier. The bid blank provided the following alternatives for bids:

A) Purchase Price $_____.

B) Lease Price $____/Month, first year (renewable)
$____/Month, second year (renewable)
$____/Month, third year

C) One year guaranteed nonroutine, major maintenance and repair on lease equipment (renewal annually for term of lease) $_____.

D) Make and Model of Equipment _____.

E) Manufacturer's Warranty _____.
(minimum of 6 months or 1000 hours)

F) Delivery _____ days (from date of order)

G) Delivery Charges $_____.

H) Location of Maintenance Services _____.

34. Since the District was then "primarily" (but not exclusively) "interest in" a three year lease-purchase, the bid blank form was incomplete and unclear. Paragraph A) of the bid blank form clearly provides for a bid for an outright purchase only, not a "lease-purchase." And paragraph B) provides only for a *lease* without any mention of purchase; paragraph B) asks for a price by month for the first year, with the notation that the lease is renewable (apparently at

141

the option of the District), a *lease* price by month for the second year, with the notation again that the lease is renewable (at the option of the District), and a *lease* price per month for a third year, with no mention of any further renewability. Paragraph B) says nothing about purchase of the drill rig, ownership at the end of the lease term, or the buy-out price at the end of the lease term. Moreover, the rest of the invitation for bids is similarly incomplete and unclear. Although the first page of the invitation for bids states that bids were requested on a "lease-purchase" of one rotary drill rig, the specification sheet attached to the invitation stated the specification that the bid should be "for purchase *or one year lease. . . .*" P. Ex. 3 (E.S.). The specification said nothing about a three lease-purchase.

35. P. Ex. 3, the second invitation for bids, was sent to all entities that had submitted a bid in response to the first invitation for bids. These included five companies that were Speedstar SS-135 dealers and the Petitioner.

36. Only two bids were received in response to the second invitation for bids, one from Mid America and one from the Petitioner. The second Mid America bid is P. Ex. 11. The Petitioner's second bid is P. Ex. 4.

37. The bids were opened on November 20, 1986. The opening was attended by Ron Owens, President of Mid America, and Robert Auld. Mr. Schenk announced that the Petitioner was the apparent low bidder. Mr. Schenk may have only intended his announcement of apparent low bid to have been with relationship to the bid for outright purchase. A bid tabulation sheet was prepared. P. Ex. 5. Mr. Schenk also announced that the recommendation by the staff to the District Board as to which company should be awarded the contract would be made at the next Board meeting. At that time, the next Board meeting was January 14, 1987.

38. The Petitioner's bid, typed on the bid blank required by the District, provided in pertinent part the following:

A)  Purchase Price $*146,976.00*

B)  Lease Price $*NO BID*/Month, first year (renewable)

(OWNED AT END OF SECOND YEAR)

$*6,885.00*/Month, second year (renewable)

(OWNED AT END OF THIRD YEAR)

$*4,592.00*/Month, third year

C)  One year guaranteed nonroutine, major maintenance and repair on lease equipment (renewable annuall for term of lease)

142

$ *NOT AVAILABLE*

D) Make and Model of Equipment *FAILING MODEL CF-15 Combination Drill*

*GEORGE E. FAILING COMPANY* standard

E) Manufacturer's Warranty *warranty policy will apply, extended for 9 months*

(minimum of 6 months or 1000 hours)

F) Delivery *120* days (from date of order)

G) Deliver Charges $*NO CHARGE*

H) Location of Maintenance Services *GEORGE E. FAILING COM-PANY*

2100 Starkey Road
Largo, Florida 33541

39. Mid America submitted its bid on the bid blank form as follows:

A) Purchase Price $*179,823.00*

B) Lease Price $*5,241.00*/Month, first year (renewable)

$*5,241.00*/Month, second year (renewable)

$*5,241.00/Month, third year*
*(SEE CONDITIONS BELOW)*

C) One year guaranteed nonroutine, major maintenance and repair on lease equipment (renewable annually for term of lease) $*3,000.00 per year*

D) Make and Model of Equipment *Speedstar SS-15*

E) Manufacturer's Warranty *6 months or 1000 hours*

*(minimum of 6 months or 1000 hours)*

F) Delivery *21* days (from date of order)

G) Delivery Charges $*Included/No Charge*

H) Location of Maintenance Services *Ocala, Florida*

\*    \*    \*

*CONDITIONS*

#1. If the lease is written for a guaranteed 36 month period, there will be a purchase option available at the end for $1.00

#2. If the lease is written as a yearly renewable lease and runs 3 consecutive years there will be a purchase option available after the 36th payment for $8,092.00.

143

40. The bid of Mid America was for a Speedstar SS-135, and thus complied with the specifications in that respect.

41. The bid of Mid America was clear and enabled the District to understand what its annual budgetary obligations might be should the alternatives in the bid be accepted.

42. The Mid America bid provided the following three alternatives:

a. Outright purchase for $179,823, which was $32,847 more than the bid of the Petitioner of $146,976.

b. Payment of a total of $188,676 over a three year period plus an additional payment of $8,092 at the end of the lease if the lease were to be written as yearly renewable for 3 consecutive years, for a total cost of $196,768.

c. Payment of a total of $188.676 (plus a $1 buy-out option) over a three year period if the lease were to be written for a guaranteed 36 month period. This is the alternative ultimately accepted by the District.

43. After publication of the second invitation for bids, but before the opening of those bids, Ms. Vergara appeared before the District Board to explain the manner in which the invitation for bids had been drafted. In particular she explained that the invitation used a "brand name or equivalent" specification. She further advised the Board that the staff recommended the Speedstar SS-135 as the equipment most capable of handling the drilling needs of the District, and that any equipment purchased must be at least equivalent to the Speedstar SS-135.

44. At some time before the opening of the second set of bids, Mr. Munch and his supervisor, Ms. Vergara, traveled to the offices of Mid America and inspected a Speedstar SS-135. The owner and president of Mid America was present to explain the design advantages of the Speedstar SS-135. He was a salesman, and had no background in engineering or drill rig design.

45. None of the District staff visited the Petitioner's place of business to inspect a Failing CF-15. Mr. Munch and Ms. Vergara did not see a Failing CF-15 until preparations began for the formal administrative hearing.

46. In a deposition prior to the formal hearing, Mr. Schenk testified under oath that the staff had already decided that they wanted a Speedstar SS-135 rather than a Failing CF-15 based upon the report of Ms. Vergara to the District Board.

47. In a deposition prior to the formal hearing, Mr. Munch testified

that he was never asked which rig he would rather have, that the issue was strictly a cost decision, that he probably would have had no objection to purchase of the Failing CF-25 had it been cheaper than the Speedstar SS-135, and that the Failing CF-15 would probably have done the job needed by the District to be done.

48. On December 12, 1986, Mr. Schenk sent a memorandum to the District Board concerning the purchase of the rotary drill rig. The memorandum advised the Board that the District had received two bids. It then presented five alternatives for the Board to consider. All of the bid alternatives (alternatives 1 through 4) related to the Mid America bid on the Speedstar SS-135, and presented all of the options bid by Mid America. None of the bid alternatives related to the Petitioner's bid. The District Board was not advised as to the comparative purchase prices bid by the two bidders (the Petitioner's price being $32,000 less than Mid America's), it was not advised as to the two interpretations of the three year option in the Petitioner's bid, and it was not advised that under the second interpretation of the Petitioner's three year lease-purchase bid, the Petitioner's bid had a net cost, after accounting for delivery time, that was $9,529 less than the Mid America bid. (See finding of fact 60.)

49. Mr. Schenk thought that paragraph B), as modified by the "CONDITIONS" placed on the bid by Mid America, presented an option to "renew" the lease *monthly* at $5,241 per month, for an annual cost of $62,892. Evidentally, then, Mr. Schenk thought that the word "renewable" pertained to renewal by month. P. Ex. 15, p. 2, para. 2. With respect to this option, nothing is mentioned about purchase. Mr. Schenk also treated the word "renewable" to be intended to be exercised annually, resulting in a three year lease (renewable annually). The differing use of the word "renewable" came as a result of the modifications placed on the bid form by Mid America.

50. The District Board chose option 3, which was condition number 1 on the bid blank submitted by Mid America, (a guaranteed 36 months lease with a purchase option of $1.00) with the addition of the words "subject to the availability of funds." The second invitation for bids had stated in paragraph 3 of the third page that "all lease-purchase agreements must include a 'nonappropriation of fund' paragraph as required by Florida Statutes." Thus, the condition that the lease be "guaranteed" was modified by the District consistent with the specifications of the invitation for bids relating to the appropriation of funds.

51. On the date of the District Board meeting approving a lease-

purchase with Mid America, January 14, 1987, the District entered into a contract with Mid America for the lease-purchase of a Speedstar SS-135. SJRWMD Ex. 3. The lease agreement contains a paragraph allowing the District to terminate the lease upon nonappropriation of funds, subject to certain conditions. Id., para. 11.

52. In February, 1987, Mr. Auld learned at a trade show in Orlando that the District had awarded the contract to Mid America. Mr. Auld called Ms. Mildred Horton, the Assistant Executive Director of the District, to ask for the reasons why his bid was not accepted. Ms. Horton wrote a letter to Mr. Auld dated February 17, 1987, setting forth the reasons for the award to Mid America and attaching two amortization schedules, one for each bid. The letter and attachments is P. Ex. 6. Ms. Horton stated that the schedules attached were the only ones in existence, to her knowledge. None of the reasons given by Ms. Horton for the rejection of the Petitioner's bid could have been known prior to the opening of the bids.

53. The amortization schedules attached to Ms. Horton's letter had been prepared by Mr. Schenk. The schedule for the Petitioner's bid showed a total cost over a three year period of $224,344, which resulted in an effective interest rate of 31% compared to the outright purchase price on the Petitioner's bid of $146,976. The schedule assumes that the Petitioner's bid was for a monthly payment of $6,885 for two years followed by a monthly payment of $4,592 in the third year. P. Ex. 6.

54. Mr. Schenk testified that he considered the possibility that the Petitioner's bid for a three year lease purchased was $4,592 per month for 36 months, and prepared an alternative amortization table based upon that possible interpretation as well as the amortization table attached to the letter sent to Mr. Auld by Ms. Horton described above. P. Ex. 12. Mr. Schenk concluded, however, that the Petitioner's bid should be interpreted as a bid of $6,885 per month for two years *and* $4,592 for the third year, for a total cost of $224,344. He testified that it was confusing that the Petitioner's bid did not contain a price for the first year, but he also concluded that the price of $6,885 placed on the second line of paragraph B) of the Petitioner's bid was intended to be a price for both the first year and the second year. He further testified that the Petitioner's bid may have been more understable had the word "renewable" been stricken on the bid form. Finally, he testified that he disregarded the additions to the Petitioner's bid form because these were "alternations" to the form, but considered the additions to the bid form by Mid America because these were only "additions."

55. As discussed above, after the second invitation for bids was

146

published, the District was primarily interested in receiving bids for a three year lease-purchase. The bid blank in the second invitation for bids, however, failed to provide a clear method for bidders to bid that option. Paragraph B) of the bid blank drafted by the District was defective because it did not in any manner state that a purchase (a transfer of ownership) was included in the "lease" for which a price was being asked, because it failed to state whether the District wanted bids on a one year lease-purchase, a two year lease-purchase, a three year lease-purchase, or only a lease for those periods of time, because the word "renewable" was susceptible of being interpreted as renewal from month to month as well as from year to year, as so construed in Mr. Schenk's December 12, 1986 recommendation to the District Board. Paragraph B) was also defective because it failed to provide a place to show the price of the purchase option at the end of the lease, or zero if there were to be none. Without the "CONDITIONS" attached to the Mid America bid, the filled-in blanks of paragraph B) on the bid form only resulted in a bid on a *lease*. Mr. Schenk recognized this as he construed paragraph B) of the form as only asking for a lease bid when he informed the District Board of option number 2 in his memorandum of December 12, 1986. P. Ex. 13.

56. Since the bid form was defective, it was foreseeable that bidders would have to have added additional words to the bid form to make it sensical. It was also foreseeable that different bidders would take different approaches in trying to draft additions to the form to enable them to bid all critical aspects of a lease *that included a purchase at the end of the lease.* The bid of the Petitioner should have been construed with this foreseeability in mind. In particular, the failure of the Petitioner to place a price on the first line of paragraph B) (relating to the first year) coupled with the placing of a price at the second year line and the third year line, and the addition of the words "owned at end of second year" and "owned at end of third year" should have been construed as the Petitioner's attempt, like the attempt of Mid America, to cure the ambiguities in the bid form. As discussed above, without such words, a price in the first line of paragraph B) of the bid form would have only been a bid for a renewal lease for one year, with no purchase option. The District argues that it did not ask for a bid on a two year lease-purchase, and that the Petitioner's attempt to bid on that as well as on a three year lease-purchase caused confusion. But the problem is that the bid form, as discussed above, did not ask for *any* purchase associated with a lease, *and* asked for prices for a lease that could have either a one, two or three year term based upon the option to renew. It was not unreasonable, then, for the Petitioner to have bid a two year lease-purchase.

147

57. The interpretation of Petitioner's bid as a bid for a total cost of $224,344 over three years is not reasonable. The interpretation of the Petitioner's bid as providing for a total cost of $224,344 over three years results in an interest cost of 31%, a rate of interest that is facially unreasonable. But more important if, as assumed in that interpretation, the District were to enter into a contract with the Petitioner at a monthly charge of $6,885 per month for two years, it would *own* the Failing drill rig at the end of the second year. This is so because the same line that contains the price ($6,885) also has the added words "owned at end of second year." If it owned the rig after two years, the District surely would not continue leasing it for the third year at $4,592 per month. Payment of $6,885 for 24 months would cost a total of $165,240, which reasonably compares to Petitioner's outright purchase price of $146,976, plus the cost of paying over a two year period.

58. Since it was more reasonable to construe line two of the paragraph B) of the Petitioner's bid form as a bid for a two year lease-purchase, the third line should have been given the same construction, that is, to construe the price placed on the line as the price each month for the entire period (here, three years) with ownership automatic at the end of the term. The reasonable interpretation of line 3 of paragraph B) of the Petitioner's bid is for a lease-purchase for three years at $4,592 per month, for a total cost over three years of $165,312, the rig then being owned by the District at the end of 36 months with no buy-out cost. The reasonableness of this interpretation is further supported by the fact that payment of $165,312 on a machine that cost $146,976 to buy outright results in an interest rate for payment over three years of 7.9%, which is a normal and usual interest rate that would be expected in a competitive bid. P. Ex. 12.

59. Mid America's bid offered to deliver in 21 days, while the Petitioner offered to deliver in 120 days. Since the District was then renting drilling equipment at $4,612 per month, it would potentially have incurred about one month extra rental ($4,612) on the Mid America bid, and $18,448 for four months extra rental on the Petitioner's bid, or an additional cost of $13,836 on the Petitioner's bid.

60. Including this cost of rental during the potential delivery period, the net cost of the Petitioner's three year lease-purchase bid was $183,760, and the net cost of the Mid America bid alternative that was accepted was $193,289. Thus, with respect to the bid actually accepted by the District, the Petitioner's bid was $9,529 less than the bid of Mid America.

61. During the formal administrative hearing, it appeared from the

148

evidence that the District relied upon the following additional issues, other than price, as the reasons for selection of the Mid America bid:

a. One year guaranteed nonroutine, major maintenance and repair on the lease equipment, renewable annually for the term of the lease.

b. A manufacturer's warranty of at least 6 months or 1,000 hours.

c. The delivery date.

d. The location of the maintenance services.

All of the foregoing were bid specifications printed on the bid form. P. Exs. 11 and 4. Of these, only the issue of nonroutine maintenance was mentioned in the letter of Ms. Horton to Mr. Auld on February 17, 1987. P. Ex. 6.

62. Mid America bid $3,000 per year for nonroutine maintenance. The Petitioner stated on its bid form that this item was "not available." Nonroutine maintenance is needed only at the end of the warranty period. In the industry, it is well understood that nonroutine maintenance normally does not apply and is not purchased until the end of the warranty period. The District had not purchased the nonroutine maintenance at the time of the formal administrative hearing. The prices quoted in the bids, pursuant to the invitation for bids, were to have been fixed only for 90 days. Thus, it is uncertain whether the $3,000 bid of Mid America for nonroutine major maintenance would still hold. The term "nonroutine, major maintenance and repair" was not further defined by the bid form.

63. Although the Petitioner did not bid on nonroutine maintenance, it did offer a one year warranty which was six months beyond the minimum specified by the District. Thus, for this six months period only, the Petitioner effectively provided a free nonroutine maintenance offer at least to extent of the warranty. But the Petitioner failed to offer nonroutine major maintenance for the 24 month period following the first year of the lease.

64. Both bidders complied with the specifications with respect to the manufacturer's warranty, but the Petitioner offered a warranty that was better by six months. The District Board was incorrectly advised that the Petitioner's warrant was only for 90 days (and thus not in compliance with specifications). P. Ex. 13

65. The delivery date was considered during the hearing only with respect to the cost of rental of equipment until the new rig would be delivered, and thus was an element of net cost discussed above. The Petitioner's deliver date caused its bid to have an additional rental cost

149

of $13,836 as compared to the Mid America bid, but the Petitioner's total net cost still was lower than the Mid America bid, as discussed above.

66. The Petitioner's location of maintenance services was Largo, Florida, and Mid America's location was Ocala, Florida. Mid America's location is approximately 100 miles closer to Palatka than the Petitioner's location. The difference is a difference of about 4 hours in travel time, roundtrip, or only two hours for delivery of a part. Mr. Schenk testified that this factor carried only "some weight." Mr. Schenk did not know how often maintenance might be in the field rather in the seller's shop, or the problems that might occur from lack of a part. From the testimony of Mr. Winchester, who was the only rig expert who testified, and the testimony of Mr. Munch regarding the leased Speedstar rig, it appears that maintenance on the rig for major problems should not occur very often, if at all, and that many problems can be corrected in the field. In most cases, parts will have to come overnight by bus. It is inferred that a part from Ocala will arrive no sooner by overnight bus than a part from Largo by overnight bus. Thus, the closer location of the Mid America shop is of little importance on this record.

67. The February 17, 1987, letter from Ms. Horton to Mr. Auld stated that the failure of the Petitioner to bid on a one year lease was one of the reasons for not accepting the Petitioner's bid. As discussed above, the District was primarily seeking a three year lease-*purchase,* not a one year lease, and communicated this to the two bidders. Indeed, it was the existing one year lease that prompted the desire by the Board to explore a purchase over time. The District did not enter into a one year lease with Mid America, either. Thus, a bid on a one year lease was not a material or substantial part of the bid specifications.

68. Specification number 2, listed as a desired option, was that the drig rig have a five speed transmission. The Speedstar SS-135 had a five speed transmission, thus giving it a lower first gear, and the Failing CF-15 did not. There is no evidence that the Petitioner could have offered a five speed transmission. On the other hand, there is no evidence that a four speed transmission would not effectively meet the needs of the District. The only evidence was that the five speed transmission would have a lower first gear, but there was not substantial evidence that the District would encounter drilling circumstances needing only the lower gear of the Speedstar SS-135.

69. When the rotary table is retracted on the Speedstar SS-135, the

150

opening is 18 inches in diameter, thus allowing the Speedstar SS-135 to set 16 inch casing. The Speedstar SS-135 otherwise marginally has the power and related mechanical ability to drill and set 16" casing, particularly lighter PVC casing, to depths of 80 feet in about six hours. Drilling the first 80 feet in six hours is very slow in comparison to the normal operation of either the Speedstar SS-135 or the Failing CF-15, and would be more a matter of use of the mud pump to wear away the soil rather than actually drilling the hole. However, the Speedstar SS-135 is in fact being used in Florida by other owners to drill and set 16 inch casing.

70. When the rotary table is retracted on the Failing CF-15, the opening is 14½ inches in diameter, and thus the Failing CF-15 does not have any capacity to drill or set 16 inch casing. If the District had chosen the Failing CF-15, in those cases in which it needed to drill and set 16 inch casing, it would have to contract out to a larger drill rig to drill and set such casing.

71. In all other respects the Speedstar SS-135 and the Failing CF-15 are functionally equivalent machines, and are considered to be equivalent in the industry. For the most part, the design differences explained by Mr. Munch with respect to the video tapes of view of both machines were not differences causing the machines to be not functional equivalents, except as discussed above.

72. The recommendation of the staff of the District to purchased the Speedstar SS-135 would probably have been the same, based upon factors other than price, had the staff considered the bid of the Petitioner to have been $9,529 less than that of Mid America for a three year lease-purchase, as discussed in finding of fact 60.

73. While the District entered into the process of obtaining bids for the drill rig with a preference for a rig capable of performing like the Speedstar SS-135, it did not intend to favor the Mid America Company over the Petitioner, nor did it act in bad faith.

74. At all times relevant to these invitations for bids and award of the contract, the District did not have rules governing purchasing of commodities or governing the notification to interested persons concerning the procedures for contesting a proposed purchase. It did not have any policy or rule requiring that the lowest bid be accepted without consideration of other factors. It did have written policies, SJRWMD Exs. 1 and 2, providing for the following:

    a. Purchases in excess of $5,000 must be advertised in a newspaper of general circulation no less than ten days prior to bid opening.

    b. The District Purchasing Director may withdraw the entire pro-

posal, and may reject all bids or parts of bids, if the District's interest will be served by that action.

c. Departments or Divisions of the District submitting requisitions must do so with items described in such terms to allow unrestricted bidding and to afford full opportunity to bid to all qualified bidders.

d. Any purchase order made contrary to the provisions of the purchasing policies shall be of no effect and void.

## Conclusions of Law

1. The Division of Administrative Hearings has jurisdiction over the parties and the subject matter of this case.

2. Since the substantial interests of the Petitioner are at stake with respect to the decision of the District to award the contract to Mid America, the Petitioner is entitled to a formal administrative hearing pursuant to section 120.57(1), Fla Stat. (1986).

3. Since the parties agreed that the Petitioner timely filed a notice of protest and formal written protest, the applicability of section 120.53(5), Fla. Stat. (1986) to the District is not an issue in this case. That section, if applicable, defines certain procedural steps necessary for a timely protest and formal written protest, a matter no longer at issue due to the stipulation.

4. The Petitioner has not identified any statutory or rule provisions which govern the instant purchase by the District of a rotary drill rig. At common law in Florida, and in the absence (as here of governing statutes or rules) a public body is under no requirement that contracts be let only through competitive bidding, or that a particular bidding procedure be followed, or that contracts be awarded only to the lowest and best or lower responsible bidder; the only requirement is that the award not be arbitrary or capricious. *Volume Services Division of Interstate United Corporation, et al. v. Canteen Corporation, et al.,* 369 So.2d 391, 395 (Fla. 2d DCA 1979). Moreover, at common law in Florida, and absent statutory or rule constraints, a public body has wide discretion in soliciting and accepting bids for public improvements, and, when based upon an honest exercise of this discretion, the award will not be overturned even if it may appear that the award was erroneous or that reasonable persons may disagree concerning the propriety of the award. *Liberty County, et al. v. Baxter's Asphalt & Concrete, Inc.,* 421 So.2d 505, 507 (Fla. 1982).

5. The District is, however, bound by the terms it adopted in the second invitation for bids and its own written policies governing

purchases of commodities. As discussed in finding of fact 74, the District has the following written policies relevant to this case:

a. Purchases in excess of $5,000 must be advertised in a newspaper of general circulation no less than ten days prior to bid opening.

b. The District Purchasing Director may withdraw the entire proposal, and may reject all bids or parts of bids, if the District's interest will be served by that action.

c. Departments or Divisions of the District submitting requisitions must do so with items described in such terms to allow unrestricted bidding and to afford full opportunity to bid to all qualified bidders.

d. Any purchase order made contrary to the provisions of the purchasing policies shall be of no effect and void.

6. There is no issue concerning the advertisement of the invitation for bids and the District Purchasing Director has not elected to withdraw the entire proposal, so these policies do not apply to this case.

7. The policy contained in subparagraph c concerning submission of requisitions so as to allow unrestricted bidding and to afford full opportunity to bid by all qualified bidders was made an issue by the Petitioner during the formal hearing and in its proposed findings of fact and conclusions of law. However, the second invitation for bids specified that a "[b]idder must indicate any and all exceptions to specifications." Finding of fact 32. There is no evidence that any of the Petitioner's arguments concerning the specifications contained in the second invitation for bids were ever made known to the District prior to bidding, or, for that matter, before the bids were opened. Thus, the Petitioner waived all objections to the specifications, and cannot raise those issues now.

8. The second invitation for bids contained the following District policy applicable to this invitation for bids:

Bid shall be awarded to the lowest qualified, responsible bidder whose bid meets all specifications in the Invitation to Bid, including delivery, price and other factors most advantageous to the District.

9. The District did not present any evidence to support a policy other than that described in paragraph 8 above, and thus that policy governs this case.

10. The Petitioner was the lowest bidder for a three year lease-purchase, which is the arrangement selected by the District and the

arrangement that it was primarily interested in, as it communicated to all bidders. The Petitioner's bid was $9,529 less than the mid of Mid America after accounting for differences in delivery dates. See findings of fact 55-60.

11. There is no evidence that the Petitioner is not a qualified or responsible bidder.

12. There is considerable evidence, however, concerning whether the Petitioner's bid on a Failing CF-15 met all the specifications of the bid.

13. The Petitioner's bid complied with the warranty specifications, and was twice as long as that offered by Mid America. See finding of fact 64.

14. The District did not present any evidence that the Petitioner's bid failed to meet specifications with respect to delivery date. The District analyzed this issue primarily with respect to the additional rental costs that would occur during a 120 day delivery period, and those costs have been subsumed within the price analysis above. While the Petitioner's delivery date was 99 days longer than that of Mid America, the overall price still was less by $9,529. See finding of fact 65.

15. The Petitioner's bid complied with the specifications concerning location of maintenance services, and the location of Petitioner's maintenance services was functionally equivalent to the location of the maintenance services of Mid America. Finding of fact 66.

16. Except as will be discussed ahead, the mechanical performance and potential of the Failing CF-15 was functionally the equivalent of the Speedstar SS-135. Findings of fact 71 and 68.

17. The failure of the Petitioner to bid on a one year lease was immaterial in this case, and does not cause the Petitioner to fail to comply with a material specification. The District was not interested in a one year lease since that was the prior arrangement, an arrangement the District sought to change by the invitation for bids. See findings of fact 6 through 8. The District was interested in a three year lease-purchase, and communicated that fact to bidders. The District actually awarded a three year lease-purchase, not a one year lease. Finding of fact 67. Immaterial variations from specifications do not cause a bid to be unacceptable for failure to meet specifications. *Tropabest Foods, Inc. v. State of Florida, Department of General Services,* 493 So.2d 50, 52 (Fla. 1st DCA 1986). The failure to bid on a one year lease is immaterial in this case because it did not give the Petitioner a

154

substantial advantage over other bidders, and the Petitioner did not derive a palpable economic benefit from the deviation. *Tropabest,* supra. See also *Liberty County,* supra, 421 So.2d at 507.

18. The Petitioner's bid failed to meet the specification that the seller offer one year of guaranteed nonroutine, major maintenance and repair renewable annually for the term of the lease. This specification is apparently of lesser significance to the District because of the District had not yet exercised this option on the Mid America bid at the time of the formal administrative hearing. However, the specification cannot be determined on this record to be immaterial. While the Petitioner did provide a warranty for a full first year, its failure to bid on the nonroutine maintenance resulted in a bid that failed to give the District the option to purchase such nonroutine maintenance in the second and third years of the lease-purchase.

19. In the second invitation for bids, the District specified that the rotary drill rig to be bid must be a Speedstar SS-135 or at least the equivalent equipment. The definition of equivalency used by the District staff was based upon actual work needs of the District: equivalency was to be judged by whether an alternative drill rig would present no differences with respect to work in the field that the District need to be accomplished. Finding of fact 30. This definition of equivalency is reasonably supported on this record, particularly since it is based upon the essential purposes intended by the District for the new equipment.

20. The District presented credible evidence concerning its current responsibilities to construct a regional groundwater monitoring network in the 19 counties that comprise the District. The evidence showed that the District will need from time to time to have the capability of constructing well casings to provide support for drill holes, and to exclude intrusion from shallower water tables. The evidence further demonstrated that from time to time the District will need to construct 16 inch casings in the first 80 feet of these wells.

### Recommendation

For these reasons, it is recommended that the St. Johns River Water Management District enter its final order that the bid of the George E. Failing Company pursuant to Bid Number 87-01, second call for bids, dated November 6, 1986, was properly rejected because it did not meet all specifications of the invitation to bid.

DONE and ENTERED this 28th day of August, 1987.